GRACE SCOTT, Administratrix, Appellee, v. RALPH HINMAN, Appellant.

No. 41959.

JUNE 20, 1933.

OPINION AS MODIFIED ON PETITION FOR REHEARING OCTOBER 17, 1933.

Gleysteen, Purdy & Harper, J. M. Parsons, and O. H. Montzheimer, for appellant.

Diamond & Jory, and Locke & Lampman, for appellee.

MITCHELL, J.—Primary road No. 21, a paved arterial highway, runs south from Primghar, Iowa. There is a series of three hills on this paved highway. Fjeld Hill is the hill to the north, then a hill referred to in the record as Collision Hill, and the hill to the south of Collision Hill, known as Wahl Hill. Collision Hill lies between the two higher hills, the one on the north known as Fjeld Hill and the one on the south known as Wahl Hill. Fjeld Hill descends southward for a distance of 1,865 feet, reaching a bridge at the foot thereof, and from said bridge there is a uniform ascent to the top of Collision Hill, which is a distance of 1,160 feet from said bridge. At the top of Collision Hill there is what is referred to in the record as a level space of 50 feet. It is not really level, but the ascent is not quite so steep. From the top of Collision Hill descending southward on the south side of said hill there is a uniform descent for a distance of 550 feet to the foot of the hill, from whence, still proceeding southward, there is an ascent to the top of Wahl Hill, which is not as high as Fjeld Hill but which is much higher than the top of Collision Hill. One ascending Collision Hill from either the north or the south cannot see beyond the hill until one virtually reaches the top of the hill. From the top of Wahl Hill one can see half to two-thirds of the south slope of Fjeld Hill.

The appellant, Ralph Hinman, for 41 years had been a resident of Primghar, Iowa, and was thoroughly familiar with all the hills and the paved highway, No. 21, over which he had traveled a great many times, and was well aware of the fact that paved highway No. 21 was greatly in use and that there was considerable traffic on it. He was also aware of the fact that while ascending northward on Collision Hill he could not see a car coming from the other side of Collision Hill until he virtually got on top of Collision Hill.

On the afternoon that the accident occurred the appellant was driving his own Buick car, accompanied by one William Schee, and was approaching the top of Collision Hill from the south, following at a distance of 55 to 60 feet a car driven by one Clark and traveling between 35 and 40 miles per hour. When about 55 feet south of the south edge of the top of Collision Hill, and being then only about 20 feet behind the Clark car, and being in a position where, from his own testimony, he admits that he could not see beyond the top of the hill, the appellant attempted to pass by and around the said Clark car by turning to his left, or onto the west half of the said paved highway.

The appellee's intestate, accompanied by his wife and another lady, both riding in the front seat with him, at about 4 o'clock on the afternoon of May 13, 1931, was approaching the top of Collision Hill from the north in his Nash automobile. The decedent was driving his own car. There is a little dip to the north of Collision Hill, in which a car might not be seen from the point where the appellant started to pass the Clark car. When the appellant reached the left side, or the west side of the road, and a little behind the Clark car, he saw for the first time the Scott car approaching from the north. It was at that time about twelve rods north of the appellant's car. The appellant, apparently realizing that it was impossible to cut behind the Clark car and over on the east side of the paved highway, turned his car to the left and headed toward the shoulder to the west, off the pavement. The Clark car turned slightly to the east, and the Scott car, in attempting to avoid the Hinman car, turned slightly eastward. The right front fender of the Hinman car struck the right-hand side of the decedent Scott's car. The decedent Scott received a fractured skull and other injuries from which he died a few hours later.

The decedent Scott, at the time of the collision, was 32 years of age, and owned and operated two moving picture houses in the city of LeMars, Iowa. He was a hard-working, frugal man, in the best of health, and, the record shows, was an industrious individual. The appellee is the administratrix of the estate of the said Dudley C. Scott, and she commenced an action against the said appellant for the sum of $65,000. The case was submitted to the jury, and the jury returned a verdict of $27,080, which amount was reduced by the lower court to the amount of $17,000, and judgment was entered

for said amount, and from said judgment the appellant has appealed to this court.

█ It is the contention of the appellant in this case that the court erred in paragraph 6 of its instructions that the failure of the appellant to turn to the right upon meeting the automobile driven by appellee's decedent constituted negligence instead of merely *prima facie* evidence of negligence. The material part of which the appellant complains here of instruction No. 6 is as follows:

"A failure to observe such statutory requirements constitutes negligence."

Speaking through Mr. Justice Albert in the case of Kisling v. Thierman, reported in 214 Iowa 911, on pages 913, 914, the court said:

"The general theory of this court in relation to this statute has been that on such highways, the driver of a vehicle has a right to use any part of the road he sees fit, except when meeting another vehicle, when he is required to give one-half of the traveled way by turning to the right. In pursuance of this thought, this court has consistently held that the fact that a vehicle is traveling on the wrong side of the road is only prima facie evidence of negligence. The first expression of the court was in Riepe v. Elting, 89 Iowa 82, 56 N. W. 285, and we have followed this pronouncement consistently in the following cases: Cook v. Fogarty, 103 Iowa 500, 72 N. W. 677; Carpenter v. Campbell Automobile Company, 159 Iowa 52, 140 N. W. 225; Herdman v. Zwart, 167 Iowa 500, 149 N. W. 631; Baker v. Zimmerman, 179 Iowa 272, 161 N. W. 479; Swanson Auto Company v. Stone, 187 Iowa 309, 174 N. W. 247; Cooley v. Killingsworth, 209 Iowa 646, 228 N. W. 880; Sergeant v. Challis, 213 Iowa 57, 238 N. W. 442.

"In Carlson v. Meusberger, 200 Iowa 65, 204 N. W. 432, and Hansen v. Kemmish, 201 Iowa 1008, 208 N. W. 277, suggestions that certain distinctions might be made have received no further attention from this court in subsequent cases, nor were the opinions in those cases turned on the suggested distinction.

"Although this doctrine is inconsistent with the pronouncement we are making in this case, the majority of the court is of the opinion that this line of decisions, under the aforesaid section of the statute, should not be disturbed, in view of the fact that it has

been the recognized doctrine of this state since the enactment of the aforesaid section in the Code of 1860. It is therefore the law that where an accident occurs outside of cities and towns, the fact that the vehicle is on the wrong side of the road is only prima facie evidence of negligence."

Again this question was before this court in the case of Ryan v. Perry Rendering Company, reported in 215 Iowa 363, 245 N. W. 301. This court said (p. 367) :

"Appellant further complains and assigns as error the use of the words, 'Negligence may also consist in doing some act which the law forbids or in the failure to do that which the law commands', when read in connection with the first paragraph of instruction 6. His objection is that, by so instructing, the jury were told, and must have so understood, that, if they found that the defendant violated the statutory command by failing to give one-half the traveled way to the plaintiff by turning to the right, the defendant was then guilty of negligence as a matter of law. Under our holding in Kisling v. Thierman, 214 Iowa 911, 243 N. W. 552, and in a number of preceding cases, the driving of a vehicle on the wrong side of a country highway is only prima facie evidence of negligence."

However the law may be in reference to that question, it is apparent from the record before us that the appellant was guilty of negligence beyond question. Therefore, if there was error in the court's instruction in the manner claimed, nevertheless it was error without prejudice because it is true beyond question that the appellant was guilty of negligence in other respects.

█ The next error that the appellant complains of is that the court admitted, over objections, testimony to show that the decedent, six years before his death, moved to LeMars, Iowa, and that he purchased two moving picture theaters and equipment for the sum of $25,000. At the time that he purchased this business he had no cash, and at the time of the death of the decedent he owed only $3,000, and still owned the business and equipment that he had purchased six years before.

The objection made by the appellant in this case, based upon the ground that there was no definite evidence as to the earning capacity of the decedent, was very well answered by this court in the

case of Bettinger v. Loring, 168 Iowa 103, on page 116, 150 N. W. 31, 36. This was a case where the decedent operated a livery barn, and no evidence had been offered to show that he had been accustomed to work for wages, nor was there any definite showing as to his earning capacity. The court said:

"Criticism is also directed against the court's instruction upon the measure of plaintiff's damages because of the alleged vague and indefinite character of the evidence, which it is contended does not justify the assessment of substantial damages. The objection is not well founded. The evidence on part of plaintiff tends to show that deceased was about 50 years old and left property to the amount of $1,300 and $2,500 in life insurance. It further appears that he was of industrious habits. There is no evidence that he had been accustomed to work for wages or any definite showing as to his earning capacity. He had suffered some from rheumatism, but nothing to indicate that he was materially less capable of earning money than the average man of his years and experience. We think that upon the showing thus made the jury could make a reasonable and fair estimate of the value of his life to his estate, and the question was not improperly submitted by the court."

In the case at bar the evidence shows that Dudley C. Scott was 32 years of age; that he was industrious; that he was a man of ability; that he was in the best of health; that he was a man who saved his money. We believe the court committed no error in admitting testimony showing that the decedent, in purchasing the moving picture theaters which he still owned at the time of his death, had purchased them for $25,000, that when he purchased them he had no money or property, that he went into debt for the said theaters for the amount of $25,000, that he actually and personally managed, conducted, and operated said moving picture theaters during the period of six years, from the time of their purchase to the time of his death, and reduced said indebtedness against said business down to $3,000, and that the total indebtedness of the decedent at the time of his death was but $3,000. Such evidence was admissible to give the jury a general picture of the decedent's business affairs and property accumulation, along with the testimony as to his ability, health, and other kindred matters as shown by the record.

Lastly, the appellant complains that the verdict is excessive. The appellee in this case sued for the sum of $65,000. The jury re-

turned a verdict of $27,080, which the lower court reduced to $17,000. It is not easy in a death case to ascertain the exact amount of damages to which the estate is entitled. The rule, of course, is well established that "the only true measure of recovery for the death of an individual is the value of his life to his estate had he not come to such untimely end."

A very excellent discussion of the question of the amount of damages that an estate is entitled to was given by the late Justice Weaver in the case of Nicoll v. Sweet, 163 Iowa, page 683, 144 N. W. 615, L. R. A. 1918C, 1099, Ann. Cas. 1916C, 661. Speaking for the court, on page 687 of 163 Iowa, 144 N. W. 615, 617, he says:

"It is correct to say, as does the appellant, that the only true measure of recovery for the death of an individual is the value of his life to his estate, had he not come to such untimely end. It is hardly too much to say that this rule is vague, uncertain, and speculative, if not conjectural, but it is the best which judicial wisdom and experience have yet been able to formulate. No evidence is possible of the time which deceased would have lived but for the injury complained of. Had he avoided this injury, death may have met him the next day, week, or year in some other form. In business he might have become a phenomenal success and accumulated millions, or he might have lived to old age and died a pauper. From being a man of good habits and prudence and industry, he might have become a spendthrift or a tramp, or if a man of dissolute habits he might have reformed into an efficient and prosperous citizen. But the demands of justice will not tolerate the idea that human life may be extinguished by the tort of another without the wrongdoer being held to answer therefor in damages, and the rule we have stated is the one which has been devised for this purpose. The principle which underlies it is of unquestionable soundness, but the difficulty which besets its practical application is in the fact that it calls for an estimate or conclusion which must be arrived at by a balancing of mere probabilities and possibilities which we deduce by way of inference from the age, character, habits, condition, education, employment, surroundings, and apparent capacity of the deceased. Fairness to the beneficiaries of the estate on the one hand and of the defendant on the other require that the jury be put in possession of all the facts having the slightest legitimate bearing upon this intricate problem. It is concededly the law of this state that in such case the plaintiff may show that the deceased was a married man.

Wheelan v. Railroad Co., 85 Iowa 178, 52 N. W. 119. This is said to be competent because 'it may fairly be assumed that a married man will be more frugal and industrious and hence will accumulate a larger estate than a single man.' Beems v. Railroad Co., 58 Iowa 158, 12 N. W. 222."

Again, in the case of Hanna v. Central States Electric Co., reported in 210 Iowa, page 864, on page 877, 232 N. W. 421, 428, the court said:

"The rule governing the proposition under consideration may be stated as follows: 'The jury in awarding damages cannot exercise their discretion arbitrarily, but they must proceed upon the theory of compensation for pecuniary loss to the beneficiaries, and the award must be justified by the evidence. The discretion of the jury in awarding damages is always subject to the supervisory power of the court, which will not hesitate to set aside a verdict where the damages allowed are out of all proportion to the pecuniary injuries resulting from the death to the beneficiaries, or founded upon visionary estimates, or probabilities or chances, where the circumstances of the case or the evidence produced indicates that the verdict was the result of bias or prejudice.' 17 C. J., section 235, p. 1347."

Thus, in the light of the cases cited and the rules of law well established by this court, considering the evidence in the case at bar, that the decedent was 32 years of age, that he had a life expectancy of over 28 years, that he was a hard-working and industrious man, in the best of health, it is evident that the appellee was entitled to a substantial verdict. The district court cut the verdict to $17,000. We believe, in the light of the record, that the verdict should be cut to the amount of $14,500. See Rastede v. Chicago, St. P., M. & O. R. Co., 203 Iowa 430, 212 N. W. 751. With these considerations in mind, it is adjudged that if the appellee administratrix shall elect to file in this court a remittitur in excess of the sum of $14,500 within thirty days from the filing of this opinion with the clerk of this court, judgment for $14,500 will be affirmed. Otherwise, the cause and the judgment heretofore entered in the district court will be reversed.

The cause is, therefore, affirmed upon the conditions set out in this opinion.—Affirmed on condition.

KINDIG, C. J., and EVANS, STEVENS, DONEGAN, KINTZINGER, CLAUSSEN, and ANDERSON, JJ., concur.